UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY,<br><br>*Plaintiff*,<br><br>v.<br><br>COMMUTER RAIL DIVISION OF THE REGIONAL TRANSPORTATION AUTHORITY, d/b/a METRA,<br><br>*Defendant*. | Case No. |

**COMPLAINT**

Union Pacific Railroad Company brings this complaint against the Commuter Rail Division of the Regional Transportation Authority, d/b/a Metra.

**INTRODUCTION**

1. This is a suit to collect overdue compensation owed under a binding contract. Metra operates its commuter trains on three Chicago-area railroad lines owned by Union Pacific (the "UP Lines")—but it refuses to pay the reasonable compensation that Union Pacific set as a condition of granting this access. Union Pacific thus brings this action for breach of contract or, alternatively, unjust enrichment or quantum meruit.

2. For many years, Union Pacific contracted to provide commuter rail service on the UP Lines on Metra's behalf. Though the trains were Metra-branded, Union Pacific crews ran the trains and sold the tickets. The parties' relationship was governed by a Purchase and Service Agreement, or PSA.

3. In 2019, Union Pacific informed Metra that it intended to stop these services but was open to Metra operating the trains on the UP Lines. When Metra objected, the Seventh Circuit

held that Union Pacific "is not bound by any contractual promise to keep providing rail services to Metra for the indefinite future." *Union Pac. R.R. v. RTA*, 74 F.4th 884, 889 (7th Cir. 2023).

4. The parties thus began working to transfer commuter rail operations to Metra. They repeatedly extended the PSA during the transfer, which is now substantially complete. As of May 2025, Metra runs the commuter trains on Union Pacific's lines. The transition has been relatively seamless to the commuting public.

5. The parties have tried to negotiate a contract to govern this new relationship in place of the PSA. Although the parties made substantial progress on this front, they have yet to reach agreement. In particular, a major sticking point has been the compensation Metra will pay to operate on Union Pacific's lines.

6. Union Pacific seeks compensation consistent with what other passenger carriers pay for access elsewhere on its network, while Metra seeks to continue or even reduce the PSA's antiquated, below-market rates. Even after multiple offers, several in-person discussions, and a mediation through the Surface Transportation Board, or STB, the parties still could not agree on a compensation framework to replace that of the PSA.

7. After the most recent contract extension, the PSA was set to expire on June 30, 2025. But extending the PSA again was no longer tenable. The parties agree that—in the words of a Metra executive—the PSA is "byzantine," "outdated," and "overly complex."

8. At the same time, it was clear that *some* terms must govern Metra's continued use of the UP Lines—not only for compensation, but also for vital issues like maintenance, liability, indemnification, and so on. And no one wanted to see Metra's commuter service interrupted.

9. Given the parties could not reach agreement on a long-term contract, Union Pacific's position has been that Metra could keep operating on the UP Lines—on Union Pacific's

terms. After all, the tracks, rights-of-way, and facilities are Union Pacific's private property. Metra had no right to use them *except* as Union Pacific agrees. Union Pacific thus issued a Condition of Entry, or COE, to govern Metra's continued operations until the parties could reach agreement on a long-term contract.

10. The COE set various basic terms, including requiring market-level compensation. It provided that Metra would accept and be bound by these terms if Metra's trains "[a]ccess[ed] Union Pacific's Rail Lines" after the PSA expired at midnight on June 30, 2025.

11. Metra, for its part, chose to litigate. It applied to the STB for statutory rights to operate on the UP Lines without Union Pacific's consent. At the same time, Metra sued Union Pacific in this Court, asserting several contractual and antitrust claims. And, after Union Pacific issued the COE, Metra sought interim injunctive relief from both the Court and the STB, seeking to bar the COE's enforcement. If the COE were enjoined, Metra told the Court, "the agreed terms of the PSA would carry forward." Doc. 54 at 3, No. 1:25-cv-2439.

12. But Metra failed in its efforts to resurrect the expiring PSA. As this Court explained in denying injunctive relief: "Metra asserts that UP's conditions to access these lines [set forth in the COE] are too onerous, and it asks this Court to set the conditions it must meet to access the lines once the [PSA] expires on June 30." *Commuter Rail Div. v. Union Pac. R.R.*, No. 1:25-cv-2439, 2025 WL 1787514, at *1 (N.D. Ill. June 27, 2025). But the Court lacked such authority: "[T]he relief sought by Metra—essentially, a continuation of the PSA (and its $21 million usage fee) after its expiration date—goes beyond any right guaranteed by contract." *Id.* at *5. Moreover, as the Court concluded, Metra was wrong to claim "the PSA would continue to govern absent a new agreement." *Id.* at *5 n.8. As a result, "enjoining the COE would deprive the parties of an operating agreement after June 30 while requiring them to operate together." *Id.* at *5.

3

13. Metra's position was thus "a surefire recipe for new track and rail-carrier disputes—noncontractual disagreements that only the STB, if anyone, can resolve." *Id.* at *5. But the STB also denied interim relief, finding Metra had not justified an injunction or an emergency-service order. *Commuter Rail Div.—Terminal Trackage Rights—Union Pac. R.R.*, No. FD 36844, 2025 WL 1829130, at *3 (S.T.B. served July 1, 2025).

14. Thus, as June 30 arrived, Metra's only existing right to access the UP Lines flowed from the PSA—which expired at midnight. After that, Metra had no right to use the lines unless it accepted Union Pacific's terms, as stated in the COE. Metra knew Union Pacific was unwilling to allow access except under the COE. It also knew the Court had refused to extend the PSA or to "deprive the parties of an operating agreement after June 30" by enjoining the COE. *CRD*, 2025 WL 1787514, at *5. And it knew the STB had declined to intervene.

15. Knowing all this, Metra chose to keep operating on the UP Lines after June 30. Thus, under the COE's plain text—of which Metra had clear advance notice—Metra assented to be bound by the terms of the COE, which included paying the compensation prescribed therein.

16. To be sure, Metra insisted that it would *not* be bound by the COE. But simply saying it does not make it so. The rail lines are Union Pacific's private property, and the Court's and the STB's interim-relief decisions established that Union Pacific had no statutory or contractual obligation to grant Metra access on any particular terms after June 30. Thus, just as a Cubs fan accepts the terms on the back of his ticket by using it to enter Wrigley Field, Metra accepted the COE's terms by accessing Union Pacific's property to run its commuter trains. Shouting "I don't accept!" while doing so has no legal effect.

17. Indeed, because Metra has enjoyed the benefits of the COE—the only reason it could operate on the UP Lines after June 30—it is estopped from challenging the COE's validity.

4

Yet even as Metra continued to use Union Pacific's property, it insisted that the COE is invalid. It thus refused to pay the amounts due under the COE, instead paying only what it *would have owed* under the PSA. But this Court has already rejected Metra's attempt to extend the terms of that expired agreement. In short, starting on July 1, the COE was valid and enforceable, and Metra cannot contend otherwise.

18. On September 3, the STB granted Metra trackage rights under federal law to operate on the UP Lines without Union Pacific's consent. But while that decision may affect the COE's enforceability for the period after September 3—since it provides an independent basis for Metra to use the lines—it does not affect the COE's validity or enforceability from July 1 to September 3. Again, until the STB ruled, the COE was the sole source of Metra's right to operate on the UP lines. And the STB did not set any terms and conditions to govern Metra's operations, much less retroactively to July 1. The COE thus remains valid and enforceable—and the parties still have a live dispute—at least as to the period between July 1 and September 3. Indeed, the COE is the *only* set of terms that could have governed during that time.

19. The Court should declare the COE a valid contract; declare that Metra is estopped from challenging the COE's validity because it has accepted benefits thereunder; and award Union Pacific damages based on the difference between what Metra owes and what it has paid. Alternatively, the Court should hold that Metra is unjustly enriched by paying below-market rates to operate on Union Pacific's lines and award Union Pacific damages based on reasonable value for the service it is providing.

## PARTIES

20. Union Pacific is a Delaware corporation with its principal place of business in Omaha, Nebraska. Union Pacific is the largest freight railroad in the United States. It operates in the western two-thirds of the country, connecting 23 states and over 7,000 communities.

21. Metra is an Illinois municipal corporation with its principal place of business in Chicago, Illinois. A division of the Regional Transportation Authority, Metra provides public transportation by commuter rail in northeast Illinois.

## JURISDICTION AND VENUE

22. This Court has jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

23. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

**A.     Union Pacific and Metra's prior contractual arrangement.**

24. Union Pacific owns the three UP Lines, on which Metra's commuter service operates, each starting at the Ogilvie Transportation Center in Chicago: (1) the North Line, running to Kenosha, Wisconsin; (2) the Northwest Line, running to Harvard, Illinois; and (3) the West Line, running to Elburn, Illinois.

25. Union Pacific also owns and maintains the rights-of-way, bridges, signal systems, and track structures along these lines, as well as some adjacent properties, including stations and parking lots.

26. The West Line is also Union Pacific's main freight line into the Chicago market, making it one of the busiest rail lines in the United States.

27. Union Pacific acquired these lines after merging with the Chicago and North Western Railway Company (CNW) in 1995.

28. Starting in 1976, CNW and then Union Pacific operated commuter rail service on Metra's behalf on these lines. Union Pacific provided this service to Metra as an independent contractor under a purchase-of-service agreement, or PSA. Metra owned the commuter trains,

6

while Union Pacific employees operated and maintained the commuter trains and performed administrative duties, like selling tickets and collecting fares.

29. The trains that Union Pacific operated for Metra's benefit were the only commuter trains Union Pacific operated anywhere on its network.

30. In 2019, Union Pacific notified Metra that it intended to stop operating commuter rail service on these rail lines. It encouraged Metra to negotiate a resolution that would transition operation of Metra's commuter trains on the UP Lines to Metra or another independent contractor.

31. Metra responded that Union Pacific could not stop providing commuter service because, in its view, Union Pacific had federal and state common-carrier obligations to do so.

32. Union Pacific then brought a declaratory judgment action in this Court, heard by the Hon. Jorge L. Alonso. Judge Alonso held, and the Seventh Circuit agreed, that Union Pacific could stop providing commuter service for Metra: "To the extent that Union Pacific is a common carrier—rather than an independent contractor of Metra, which is the carrier from passengers' perspective—it has unfettered authority to discontinue any particular service without the [STB's] approval, as long as it does not" entirely abandon any part of its rail lines. *RTA*, 74 F.4th at 887.

33. Likewise, the idea that that "Union Pacific has a state-law common carrier duty and must seek the state's permission to toss off that yoke" is "untenable," given the preemptive effect of federal law. *See Union Pac. R.R. v. RTA*, No. 19 C 7957, 2021 WL 4318106, at *10 (N.D. Ill. Sept. 23, 2021), *aff'd*, 74 F.4th 884 (7th Cir. 2023). As the Seventh Circuit emphasized, "Union Pacific is not bound by any contractual promise to keep providing rail services to Metra for the indefinite future. The parties' contracts have start and end dates, which both sides can enforce." *RTA*, 74 F.4th at 889.

**B.    The parties transition commuter rail operations, but cannot agree on a new contract.**

34.    After the Seventh Circuit ruled, Union Pacific and Metra began negotiating in earnest to transition commuter rail operations from Union Pacific to Metra. The end goal of these discussions was for Metra service to continue operating on the UP Lines, but with Metra now providing its commuter rail operations directly.

35.    As of May 16, 2025, the parties substantially completed the transition of operational responsibility for commuter rail operations from Union Pacific to Metra. But they still needed a new agreement to govern their relationship now that Metra had assumed direct responsibility for commuter service.

36.    The parties have tried to negotiate a successor agreement to replace the PSA, but so far have been unable to do so. Instead, they repeatedly agreed to extend the PSA on an interim basis during the operational transition, with the most recent extension delaying the contract's expiration through June 30, 2025.

37.    Both parties agree that the PSA—drafted to govern the parties' former contractual relationship—is outdated and unworkable.

38.    Metra's Director of Rail Contract Management & Special Projects attested in this Court: "The current PSA is an outdated, overly complex legacy contract that no longer serves as an appropriate framework for the economic relationship between Metra and Union Pacific, particularly now that commuter rail operations have transitioned from Union Pacific to Metra." Doc. 43-8 ¶ 21, No. 1:25-cv-2439. She also attested: "The PSA includes byzantine terms … that make it nonviable as an option moving forward, and have made administration of the PSA problematic for both parties even before Union Pacific's decision to discontinue its operation of commuter rail service." *Id.* ¶ 22.

8

39. Compensation has been a sticking point in the negotiations to replace the PSA. The PSA's expiring compensation arrangement was set fifteen years ago, in 2010. Since then, both the market for providing rail capacity for passenger service and the Chicago-area real estate market have changed significantly.

40. After nearly five years of failed negotiations, in July 2024, Union Pacific proposed mediating the compensation dispute through the STB, which Metra opposed. In August 2024, the agency ordered non-binding mediation over Metra's objections, but that process also proved unsuccessful.

41. In February 2025, Union Pacific proposed settling the compensation dispute through neutral, binding arbitration. Once again, Metra refused.

42. In May 2025, Union Pacific proposed that the franchise access fee under a post-PSA contract—essentially, the rental component of compensation—should be $18.50 per train mile. This compensation arrangement was captured in a draft operating agreement Union Pacific proposed to Metra. By contrast, Metra proposed compensation be set at $6.7 to $16.9 million annually, or approximately $3.05 to $7.68 per train mile.

43. Union Pacific's proposed compensation rate is commercially reasonable. It is consistent with, or conservative compared to, fees paid by other passenger carriers for equivalent access arrangements. For instance, over the last five years, Union Pacific has negotiated multiple commercial agreements for passenger rail service, including an agreement it entered into with the Illinois Department of Transportation, or IDOT, in 2023. Under its agreement with Union Pacific, IDOT pays a per-mile train access fee *greater than* the $18.50 proposed under Metra's contractual agreement with Union Pacific. *See* Doc. 46-4 ¶ 8, No. 1:25-cv-2439.

9

44. Moreover, in September 2024, Union Pacific commissioned an appraisal to assess the value of the land beneath its tracks. The appraisal indicated that the land under the three rail lines was of "high economic value." *Id.* ¶ 32. Indeed, one economist concluded that, given the "high value of the land" underlying its rail corridors, Union Pacific would be receiving "a very low [rental] rate of return" for its property based on its proposed compensation rate, further indicating that Union Pacific's proposal is also conservative compared to the value of its real estate. *Id.* ¶ 33.

C. **Metra brings Court and STB actions against Union Pacific.**

45. On March 7, 2025, Metra sued Union Pacific in this Court asserting various breach of contract and antitrust claims. It alleged that Union Pacific had violated contractual obligations under the parties' Fixed Facilities Agreement, or the FFAs—separate contracts that govern the parties' rights regarding certain capital improvement projects along the rail lines. *See* Doc. 1, No. 1:25-cv-2439.

46. On the same day, Metra also filed an application with the STB for terminal trackage rights over the UP Lines under 49 U.S.C. § 11102. Metra asked the STB to "require [Union Pacific] to allow Metra to use these terminal facilities and, if necessary, establish conditions and compensation for that use."

47. In late May, Metra amended its complaint in this Court, adding (among other changes) a claim seeking a declaration that Metra would not be bound by the operating agreement Union Pacific had recently proposed and that "Union Pacific cannot unilaterally impose, under duress, a more than 100% increase in compensation owed to itself." *See* Doc. 37 ¶ 431, No. 1:25-cv-2439.

**D. Union Pacific issues the Condition of Entry for Metra's continued access.**

48. With the PSA's expiration looming, on June 4, Union Pacific delivered to Metra the COE, which set the exclusive terms and conditions on which Union Pacific was willing to allow Metra access to its rail lines to provide commuter rail service absent a negotiated agreement.

49. Consistent with Union Pacific's May 2025 proposal, the COE set the compensation fee for access at $18.50 per train mile. Ex. A, § 3.1. Under the COE, Metra is required to "pay all invoices within five (5) days" of receiving a billing statement from Union Pacific. *Id.*, § 3.5. In the event of a billing dispute, "Metra is required to fulfill any and all payment obligations promptly and in full, irrespective of any disputes." *Id.*, § 3.7.

50. Section 12.6 of the COE provides that Metra accepts the COE's terms by continuing to use Union Pacific's lines: "Upon the first Metra train accessing Union Pacific's Rail Lines on July 1, 2025, at or after 00:01 AM CT, Metra shall be bound by these terms and conditions of entry." *Id.*, § 12.6. Alternatively, "[u]pon any request by Metra for track authorization or occupancy to operate its trains on Union Pacific's Rail Lines—for example, by contacting Union Pacific's Harriman Dispatching Center, Lake Street Tower operator, or Union Pacific's Crew Management for train or crew operations—Metra shall be bound by these terms and conditions of entry." *Id.*

**E. The Court and the STB reject Metra's attempts to extend the PSA and enjoin the Condition of Entry's enforcement.**

51. On June 11, Metra moved for a temporary restraining order and preliminary injunction, asking this Court to "preserve the status quo" by enjoining the COE and extending the terms of the expiring PSA.

52. On June 27, the Court denied Metra's motion. The Court held that Metra was seeking "to regulate the terms on which [Union Pacific] must continue to provide Metra access to its

11

rail lines after the private agreement setting forth those terms expires," which a federal court lacks authority to do. *CRD*, 2025 WL 1787514, *6. The Court also rejected Metra's argument that "the PSA would continue to govern absent a new agreement." *Id.* at *5 n.8. As a result, "enjoining the COE would deprive the parties of an operating agreement after June 30 while requiring them to operate together." *Id.* at *5.

53. On June 30, Metra filed an emergency request with the STB seeking either a preliminary injunction under 49 U.S.C. § 1321(b)(4) or an emergency-service order under 49 U.S.C. § 11123(a). Metra asked the STB "to maintain the status quo as it existed on June 30, 2025, until further notice." *Commuter Rail Div.*, 2025 WL 1829130, at *1. Metra argued at the STB, as it did in the Court, that if it "continue[d] to use the lines," Union Pacific would "'insist that Metra has agreed to' the many terms in the COE that Metra finds objectionable." *Id.* at *2

54. On July 1, the STB denied Metra's motion, finding that "Metra has shown neither the irreparable harm needed for injunctive relief nor the emergency circumstances under which the Board may order service under § 11123." *Id.* at *3. The STB did not address "the enforceability of the COE." *Id.*

**F.     Metra decides to operate as the Condition of Entry allows, but refuses to pay the full compensation it owes.**

55. On June 30, Metra informed Union Pacific that it planned to continue using the UP Lines after the PSA expired. Ex. B. Nevertheless, Metra maintained that it had "not consented, and does not consent, to the unreasonable terms and conditions of the COE." *Id.*

56. On July 1, Metra proceeded to operate its commuter lines business as usual. In fact, to date, Metra has continued to enjoy the benefits of the COE, which is the sole basis it has to access the UP Lines since the PSA expired.

57. On July 15, Metra wired Union Pacific $7,735,681.76. *See* Ex. C. Notably, under the expired PSA, Metra was required to issue its monthly payments to Union Pacific on the 15th of every month (as opposed to five days after Union Pacific issued its invoice to Metra, per the COE). *See* Ex. A § 3.5. The amount Metra wired reflected the pricing under the expired PSA—$2,287,529.89 less than what Metra owes under the COE.

58. Union Pacific sent Metra a letter on July 22 clarifying that Metra's wire did not fulfill Metra's financial obligations under the COE, emphasizing that the COE is "the definitive document that governs both the current and future amounts owed." Ex. C. Union Pacific then explained that it would credit Metra's July 15 payment toward the July COE invoice. *Id.*

59. On August 8, Union Pacific issued to Metra the July COE invoice for $10,023,211.65, noting the outstanding balance of $2,287,529.89 after crediting Metra's July 15 payment. *Id.* After Metra failed to pay Union Pacific for this outstanding balance by August 14—as required by the COE—Union Pacific sent Metra a demand letter on August 15 notifying Metra that it was in default. *Id.*

60. Union Pacific then gave Metra until August 21 to cure its default by paying the outstanding $2,287,529.89 balance. Metra failed to do so, and to date, has failed to fully compensate Union Pacific under the terms of the COE.

G. **The STB grants Metra prospective trackage rights.**

61. On September 3, 2025, the STB granted Metra's application for terminal trackage rights, meaning it granted Metra the right to operate over the UP Lines from September 3 onward without Union Pacific's consent.

62. The STB did not set any terms and conditions to govern Metra's access—as to compensation or otherwise—on either an interim or permanent basis. Rather, it directed the parties to negotiate.

63. The STB's decision does not purport to apply retroactively in any way. Nor does it address the validity of the COE. Thus, whatever its prospective effect, it does not affect the COE's validity starting on July 1 or Metra's obligation to pay the full amounts owed thereunder for the period between July 1 and September 3.

## CLAIMS FOR RELIEF

### COUNT I
### Declaratory Judgment—Valid and Binding Contract

64. Union Pacific realleges and incorporates the paragraphs above.

65. The Declaratory Judgment Act allows a court to "declare the rights and other legal relations" of the parties to an "actual controversy within its jurisdiction." 28 U.S.C. § 2201(a).

66. Union Pacific and Metra are parties to an actual controversy over whether the COE is a valid and binding contract.

67. Union Pacific contends that the COE is valid and enforceable.

68. Metra contends that the COE "is not enforceable." Doc. 43 at 10, No. 1:25-cv-02439. Metra has refused to pay the full amounts owed under the COE.

69. The parties thus dispute whether Metra operated on the UP Lines without any governing terms starting on July 1, or whether Metra has been subject to all of the terms of the COE, including those regarding compensation.

70. A contract requires an offer, acceptance, and consideration. It also requires mutual assent, which is judged objectively based on all the facts and circumstances. Conduct can be assent, provided the assenting party had notice that certain acts or conduct would constitute acceptance. *Gaines v. Ciox Health, LLC*, 2024 IL App (5th) 230565, ¶ 28.

71. Union Pacific offered to enter into the COE by sending it to Metra on June 4, 2025.

72. Metra had clear notice of the COE's terms.

14

73. Metra accepted the COE's terms, establishing mutual assent, by seeking dispatching authority to operate, and then operating, its trains on the UP Lines after midnight on June 30, 2025, which Metra knew constituted an acceptance under the COE's terms.

74. The COE contains mutual consideration because each party is bound to take various actions of value to the other party. In particular, Union Pacific had to allow Metra to operate on the UP Lines, which Metra otherwise could not do; in exchange, Metra had to compensate Union Pacific in the specified amounts.

### COUNT II
### Breach of Contract

75. Union Pacific realleges and incorporates the paragraphs above.

76. A breach-of-contract claim requires (1) a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) injury to the plaintiff. *Ivey v. Transunion Rental Screening Sols., Inc.*, 215 N.E.3d 871 (Ill. 2022).

77. The COE is a valid and enforceable contract for the reasons above.

78. Union Pacific performed all applicable obligations under the COE, including by allowing Metra to continue to operate on the UP Lines after Metra accepted the COE's terms.

79. Metra has breached its obligation under the COE to pay the full compensation prescribed therein in exchange for the right to operate on the UP Lines.

80. On July 15, 2025, Metra wired Union Pacific a partial payment for $7,735,681.76.

81. On August 8, 2025, Union Pacific sent Metra the July invoice for $10,023,211.65, constituting the compensation Metra owed for operating on Union Pacific's lines for the entire month of July. That invoice reflected the $7,735,681.76 credit for Metra's July 15 pre-payment, showing a balance due of the $2,287,529.89 delta between these two amounts.

82. Under the COE, Metra was to pay the full invoiced amount within five days, notwithstanding any disputes.

83. As of August 14, 2025, Metra had not submitted the outstanding balance to Union Pacific for the July COE invoice as required under the terms and conditions of the COE.

84. Accordingly, on August 15, 2025, Union Pacific notified Metra that it was in default of its invoice by $2,287,529.89. In this same letter, Union Pacific notified Metra that it had until August 21, 2025, to cure its default, which Metra has failed to do.

85. Metra's failure to pay the full amount has injured Union Pacific by depriving it of the full compensation owed under the COE.

## COUNT III
### Declaratory Judgment—Estoppel

86. Union Pacific realleges and incorporates the paragraphs above.

87. "A party that accepts the benefits of an agreement is estopped from denying its existence or from performing obligations under the agreement." *Grot v. First Bank of Schaumburg*, 684 N.E.2d 1016, 1020 (Ill. App. Ct. 1997).

88. Metra accepted the COE's benefits by operating on the UP Lines starting on July 1. After June 30, Metra had no legal entitlement to use the UP Lines. The COE is the sole source of Metra's ability to use the UP Lines, because it reflects the only terms on which Union Pacific is willing to allow such use.

89. It would be unjust to allow Metra to dispute the COE's validity while at the same time enjoying the benefits thereof.

## COUNT IV
### Unjust Enrichment/Quantum Meruit

90. Union Pacific realleges and incorporates the paragraphs above.

16

91. To state a claim for unjust enrichment or quantum meruit, "the plaintiff must show that valuable services or materials were furnished by the plaintiff, and received by the defendant, under circumstances which would make it unjust for the defendant to retain the benefit without paying." *Council for Jewish Elderly v. Kurtz*, 2024 IL App (1st) 230102, ¶ 42 (cleaned up). "The measure of recovery for a quantum meruit claim is the reasonable value of the work provided, while in an unjust enrichment claim, the inquiry is focused on the benefit received and retained by the defendant." *Id.*

92. Union Pacific has provided a valuable service to Metra by allowing it to use capacity on Union Pacific's railroad lines.

93. Metra has received valuable benefits from using the UP Lines to operate its business.

94. In exchange, Metra has paid far less than the reasonable value of the service Union Pacific has provided and/or the benefit Metra has received, to Union Pacific's detriment.

95. Allowing Metra to avoid paying reasonable compensation would be inequitable.

**PRAYER FOR RELIEF**

Union Pacific requests that the Court enter judgment in its favor and against Defendant Metra and:

a. declare that the COE is a valid and enforceable contract;

b. declare that Metra is estopped from denying the COE's validity and enforceability;

c. award Union Pacific $2,287,529.89 in money damages, plus interest calculated under the formula set forth in the COE, or, alternatively, award Union Pacific the difference between the amounts Metra has paid since July 1 and the reasonable value of accessing the UP Lines during that time;

d. award Union Pacific attorneys' fees and other reasonable costs; and

e. award Union Pacific such further and additional relief as the Court deems just and proper.

September 8, 2025

Respectfully submitted,

*/s/ Bruce R. Braun*
Bruce R. Braun
Charles K. Schafer
Andrew F. Rodheim
SIDLEY AUSTIN LLP
1 South Dearborn
Chicago, Illinois 60603
312-853-7000
bbraun@sidley.com
cschafer@sidley.com
arodheim@sidley.com

Raymond A. Atkins (*pro hac vice pending*)
Tobias S. Loss-Eaton (*pro hac vice pending*)
Ogemdi Maduike (*pro hac vice pending*)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
202-736-8000
ratkins@sidley.com
tlosseaton@sidley.com
oge.maduike@sidley.com

*Counsel for Plaintiff*
*Union Pacific Railroad Company*

18